UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------X

UNITED STATES OF AMERICA

   - against -

CHRISTINO ANTONIO RODRIGUEZ,

              Defendant.

------------------------------------X

13 Cr. 154 (RWS)

SENTENCING OPINION

**Sweet, D.J.**

On August 21, 2013, Christino Antonio Rodriguez ("Rodriguez" or "Defendant") pleaded guilty to conspiracy to steal government funds pursuant to § 18 U.S.C. 371 and theft of government funds pursuant to § 18 U.S.C. 641.

For the reasons set forth below, Rodriguez will be sentenced to six months imprisonment followed by three years supervised release. A fine of $5,000 and a special assessment of $200 are imposed.

Prior Proceedings

Defendant was named in a Three-Count Indictment filed

1

in the Southern District of New York on March 6, 2013. Count One charges that from January 2011 through February 1, 2013, in the Southern District of New York and elsewhere, Raymundo I. Hernandez, Andrius E. Gonzalez Francisco, Jilfredo Gonzalez, Dawin Brito, Isabel Garcia, Cristino Antonio Rodriguez and others conspired to steal money from the United States Treasury Department as they engaged in a scheme to obtain and cash fraudulent income tax return checks. Count Two charges that from January 2011 through February 1, 2013, in the Southern District of New York and elsewhere, Raymundo I. Hernandez, Andrius E. Gonzalez Francisco, Jilfredo Gonzalez, Dawin Brito, Isabel Garcia, and Cristino Antonio Rodriguez engaged in a scheme to obtain and cash fraudulent income tax return checks. Count Three charges that from at least January 2011 through February 1, 2013, in the Southern District of New York and elsewhere, Raymundo I. Hernandez, Andrius E. Gonzalez Francisco, Jilfredo Gonzalez, Dawin Brito, Isabel Garcia, and Cristino Antonio Rodriguez possessed and used the names and personal identifying information of other persons during and in relation to the offense charged in Count two of this indictment.

The Sentencing Framework

In accordance with the Supreme Court's decision in United States v. Booker, 543 U.S. 220 (2005), and the Second Circuit's decision in United States v. Crosby, 397 F.3d 103 (2d Cir. 2005), the sentence to be imposed was reached through consideration of all of the factors identified in 18 U.S.C. § 3553(a), including the Advisory Guidelines. Thus, the sentence to be imposed here is the result of a consideration of:

(1) the nature and circumstances of the offense and the history and characteristics of the defendant;

(2) the need for the sentence imposed —

    (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

    (B) to afford adequate deterrence to criminal conduct;

    (C) to protect the public from further crimes of the defendant; and

    (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

(3) the kinds of sentences available;

(4) the kinds of sentence and the sentencing range established for —

    (A) the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines . . .;

(5) any pertinent policy statement . . . [issued

        by the Sentencing Commission];

(6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and

(7) the need to provide restitution to any victims of the offense.

18 U.S.C. § 3553(a). A sentencing judge is permitted to find all the facts appropriate for determining a sentence, whether that sentence is a so-called Guidelines sentence or not. See Crosby, 397 F.3d at 114-15.

The Defendant

The Court adopts the facts set forth in the Presentence Investigation Report ("PSR") with respect to Defendant's personal and family history.

The Offense Conduct

The following description draws from the PSR. The specific facts of the underlying conduct are adopted as set forth in that document. These crimes were investigated by a special agent employed by the Internal Revenue Service (Agent-1)

and a postal inspector employed by the U.S. Postal Inspection Service (the Case Inspector).

*Tax Scheme Involving Puerto Rican Social Security Numbers and Electronic Filing Identification Numbers*

The following is a description of a scheme involving the fraudulent use of stolen Social Security numbers to submit false and fraudulent federal tax returns. Typically, the scheme worked as follows.

Participants in the scheme employed stolen Social Security numbers (SSNs) assigned to residents of Puerto Rico and filed fraudulent federal tax returns seeking tax refunds on behalf of those individuals. Residents of Puerto Rico often do not file tax returns with the Internal Revenue Service (IRS) because such filing is not required as long as all of the residents' income is derived from Puerto Rican sources. Thus, by using Puerto Rican SSNs, participants in the scheme, among other things, minimize the risks that a legitimate federal tax return already will have been filed by the person whose identity has been stolen. The fraudulently filed tax returns claim that the filer resides in one of the fifty states of the United States, for example, in New York State.

Participants in the scheme obtain the federal tax refund checks in various ways, including by causing them to be mailed by the United States Treasury to addresses to which the participants have access. Fraudulently obtained tax refund checks may be cashed with the assistance of either corrupt bank employees, corrupt check cashers, or individuals with business checking accounts who may not be required to have the payee named on the face of the check, a person normally in Puerto Rico, appear at the time that the check is cashed. In some instances, participants in the scheme cause tax refunds to be directly deposited into bank accounts controlled by them. All electronically filed tax returns are transmitted to the IRS through an Electronic Filing Identification Number (EFIN). EFINs are issued by the IRS to electronic return originators, such as online tax software providers (e.g., TurboTax, TaxSlayer), businesses (e.g., H&R Block), or individual tax preparers (e.g., accountants) to enable them to file tax returns with the IRS.

*The Defendant's Scheme*

According to information learned by the Case Inspector, since approximately 2004, CC-1 has participated in a

scheme which involved the filing of fraudulent income tax returns using the stolen identifying information of residents of Puerto Rico. Among other things, CC-1 obtained EFINs from other co-conspirators and then used those EFINs to file fraudulent income tax returns after he had obtained stolen identifying information of residents of Puerto Rico that CC-1 had obtained from other co-conspirators. CC-1 also sold these EFINs to other co-conspirators to enable them to also file fraudulent income tax returns using stolen identifying information of residents of Puerto Rico. Further, CC-1 installed tax filing software on computers of other co-conspirators, taught co-conspirators how to use the tax software, and assisted them with setting up bank accounts to automatically have tax refunds electronically deposited into bank accounts.

At the time of CC-1's arrest, in plain view, the Case Inspector observed approximately 15 laptop computers in CC-1's home, as well as lists containing names, dates of birth, and Social Security numbers. From further conversations with CC-1, the Case Inspector learned that through a network of individuals who know how to cash Treasury checks, CC-1 also had provided fraudulent Treasury refund checks to others to cash, for a percentage of the face value of the check.

On February 4, 2013, voluntarily and at the direction of law enforcement, CC-1 placed multiple separate calls, which were recorded, to Raymundo I. Hernandez ("Hernandez"), Andrius E. Gonazlez Francisco ("Gonzalez Francisco"), and Jilfredo Gonzalez ("Gonzalez"). During those conversations, CC-1 informed Hernandez, Gonzalez Francisco and Gonzalez that, among other things, CC-1 had Treasury refund checks that had to be cashed. CC-1 arranged meetings with Hernandez, Gonzalez Francisco and Gonzalez.

On February 4, 2013, the Case Inspector observed Hernandez meet with CC-1, after he moved the meeting location with CC-1 because he did not like what he believed to be a police presence in the area. During that meeting, Hernandez agreed to use his contacts to cash the checks and took possession of approximately 80 United States Treasury checks and agreed to cash those checks for CC-1. Hernandez was arrested shortly thereafter, at approximately 8:30 p.m., after first fleeing from law enforcement.

On February 4, 2013, Gonzalez Francisco met with CC-1 at a pre-arranged location. After a discussion of percentages,

8

Gonzalez Francisco took possession of approximately 50 United States Treasury checks and agreed to cash those checks. Gonzalez Francisco also specifically asked CC-1 whether the checks were "white" or "yellow," referring to United States Treasury checks sent via the United States mail or blank checks printed using tax refund software. During that meeting, Gonzalez Francisco contacted an unknown co-conspirator, confirming that Gonzalez Francisco received "yellow" checks and asking about percentages. Gonzalez Francisco was arrested shortly thereafter at approximately 11:30 p.m.

On February 5, 2013, Jilfredo Gonzalez met with CC-1 at the prearranged location, along with Dawin Brito ("Brito"). Prior to arriving at the location, Gonzalez informed CC-1 that he would accept whatever checks CC-1 had, and requested a minimum of "150" which CC-1 understood to be 150 checks. During that meeting, CC-1, Gonzalez and Brito discussed, among other things, that they were both partners in cashing checks. After a discussion of percentages, CC-1 showed Gonzalez and Brito envelopes containing United States Treasury refund checks. CC-1 informed Gonzalez and Brito that one envelope contained 100 checks and another 50 checks, which Gonzalez and Brito both agreed to cash. Gonzalez and Brito were arrested shortly

thereafter at approximately 2:20 a.m.

On February 6, 2013, at the direction of law enforcement, CC-1 placed a call to a second co-conspirator ("CC-2") with whom CC-1 had previously worked to cash checks. During that conversation, CC-1 and CC-2 discussed, in code, that CC-1 had United States Treasury checks to be cashed. Thereafter, CC-2 informed CC-1 that he would be putting CC-1 in touch with others to cash those checks.

On February 6, 2013, a person later identified as Rodriguez called CC-1, but CC-1 missed the call. CC-1 thereafter returned the telephone call and, during that conversation Rodriguez informed CC-1 that CC-2 provided Rodriguez with CC-1's contact information and proceeded, in code, to discuss United States Treasury checks. During that conversation, Rodriguez asked what "color" CC-1 had. CC-1 thereafter arranged a meeting with Rodriguez.

On February 8, 2013, Isabel Garcia ("Garcia") called CC-1 and Garcia informed CC-1 that CC-2 provided Garcia with CC-1's contact information and proceeded to discuss the cashing of United States Treasury checks. During that conversation, Garcia

10

stated that an Arab cashed many checks previously but that she was currently using a Dominican check casher. CC-1 thereafter arranged a meeting with Garcia.

On February 10, 2013, Rodriguez met with CC-1 at a pre-arranged location. While at the meeting, and after a discussion of percentages, Rodriguez took possession of approximately 80 United States Treasury checks and agreed to cash those checks. Rodriguez was arrested shortly thereafter at approximately 4:20 p.m.

On February 10, 2013, Garcia met with CC-1 at a pre-arranged location. While at the meeting, Garcia requested "100" meaning $100,000 in United State Treasury checks. Garcia thereafter took possession of approximately 20 United States Treasury checks and agreed to cash those checks and also asked for copies of identifications that corresponded to those checks. Garcia was arrested shortly thereafter at approximately 7:15 p.m.

The Government's position is that Hernandez should be held accountable for between $400,000 and $1,000,000 in intended loss.

Brito should be held accountable for between $1,000,000 and $2,500,000 in intended loss.

Gonzalez should be held accountable for between $1,000,000 and $2,500,000 in intended loss.

Rodriguez should be held accountable for between $400,000 and $1,000,000 in intended loss.

Francisco Gonzalez should be held accountable for between $200,000 and $400,000 in intended loss.

Garcia should be held accountable for between $120,000 and $200,000 in intended loss.

Rodriguez reported that his defense counsel was retained and that he has paid a total of $15,000 for his legal representation as it relates to the instant offense. To date, Rodriguez has not returned a financial state of his accounts to the Probation Office.

Rodriguez has no prior criminal convictions.

The Relevant Statutory Provisions

The maximum term of imprisonment on Count One is five years imprisonment, pursuant to § 18 U.S.C. 371. The maximum term of imprisonment for Count Two is ten years, pursuant to § 18 U.S.C. 641. If a term of imprisonment is imposed, the Court may impose a term of supervised release of not more than three years per count, pursuant to § 18 U.S.C. 3583(b)(2). The Defendant is eligible for not less than one nor more than five years' probation per count, pursuant to § 18 U.S.C. 3561(c)(1).

The maximum fine is the greatest of $250,000 or twice the gross gain/loss from the offense per count, pursuant to 18 U.S.C. 3571. A special assessment of $100 per count, for a total of $200, is mandatory, pursuant to § 18 U.S.C. 3031.

As a result of committing the offenses alleged in Count 1 and 2 of the Information, Defendant shall forfeit to the U.S., pursuant to 18 USC 981(a)(1)(C) and 28 USC 2461, all

13

property, real or personal, constituting or derived from proceeds traceable to the offense.

According to the Government, no forfeiture or restitution is due because the defendants were arrested upon receiving the checks and thus, prior to cashing the checks.

**The Guidelines**

The November 1, 2012 edition of the <u>United States Sentencing Commission Guidelines Manual</u> has been used in this case for calculation purposes pursuant to § 1B1.11(a). The Court finds the following with respect to the Defendant's applicable offense level, criminal history, recognition of responsibility, and term of imprisonment:

Pursuant to Defendant's plea allocution, Defendant's base offense level is six. U.S.S.G. §2B1.1(a)(2). Pursuant to §2B1.1(b)(1)(H), because the loss amount exceeds $400,000, but is not more than $1,000,000, the offense level is increased by 14 levels. If the defendant accepts responsibility for his actions in a timely manner, a three-level reduction is warranted, pursuant to §3E1.1(a) and (b). Based on the

calculations above, the total offense level is 17, the sentencing range is 24 to 30 months and the fine range is $5,000 to $50,000.

The guideline range for a term of supervised release is at least one year but not more than three years per count, pursuant to §5D1.2(a)(2).  The Court shall order a term of supervised release when required by statute (§5D1.1(a)(1)), or except for a deportable alien who is likely to be deported after imprisonment, when a term of imprisonment of more than one year is imposed (§5D1.1(a)(2)).  Because the applicable guideline range is in Zone D of the Sentencing Table, the defendant is not eligible for probation, pursuant to §5B1.1.

The defendant's Criminal History Category is I.

**The Remaining Factors of 18 U.S.C. § 3553(a)**

Having engaged in the Guidelines analysis, this Court also gives due consideration to the remaining factors identified in 18 U.S.C. § 3553(a) to impose a sentence "sufficient, but not greater than necessary," as is required by the Supreme Court's

15

decision in Booker, 543 U.S. 220, and the Second Circuit's decision in Crosby, 397 F.3d 103.

Under 18 U.S.C. § 3553(a)(1), the Court considers "the nature and circumstances of the offense and the history and characteristics of the defendant." Pursuant to 18 U.S.C. § 3553(2)(A), the Court weighs the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense.

Given the Defendant's criminal history, the lack of victim impact, and the nature of the offense, the sentence imposed is appropriate.

**The Sentence**

For the instant offense, Defendant Rodriguez will be sentenced to six months' imprisonment followed by three years of supervised release.

The standard conditions of supervision (1-13), set forth in the judgment, shall be imposed with the additional special conditions:

(1) The defendant shall provide the probation officer with access to any requested financial information.

(2) The defendant shall not incur new credit charges or open additional lines of credit without the approval of the probation officer unless the defendant is in compliance with the installment payment schedule.

(3) The defendant will participate in a program approved by the United States Probation Office, which program may include testing to determine whether the defendant has reverted to using drugs or alcohol. The Court authorizes the release of available drug treatment evaluations and reports to the substance abuse treatment provider, as approved by the Probation Officer. The defendant will be required to contribute to the costs of services rendered (co-payment), in an amount determined by the probation officer, based on ability to pay or availability of the third-party payment.

(4) The defendant shall submit his person, residence, place of business, vehicle, or any other premises under his control to a search on the basis that the probation officer has

17

reasonable belief that contraband or evidence of a violation of the conditions of the release may be found. The search must be conducted at a reasonable time and in reasonable manner. Failure to submit to a search may be grounds for revocation. The defendant shall inform any other residents that the premises may be subject to search pursuant to this condition.

(5) The defendant is to report to the nearest Probation Office within 72 hours of release from custody.

A fine of $5,000 is imposed. The balance due in any fine obligation shall begin collection to begin during any term of incarceration imposed by the Court, under the terms listed below and the balance to be paid during any term of supervised release. If the defendant is engaged in a BOP non-UNICOR program, the defendant shall pay $25 per quarter toward the criminal financial penalties. However, if the defendant participates in the BOP's UNICOR program as a grade 1 through 4, the defendant shall pay 50% of his monthly UNICOR earnings toward the criminal financial penalties, consistent with BOP regulations at 28 C.F.R. §545/11. The remainder of any fine due shall be paid in monthly installments of not less than 15% of any total gross monthly income over a period of supervision to

commence upon the release from custody. The defendant shall notify the United States Attorney for this district within 30 days of any change of mailing or residence address that occurs while any portion of the restitution remains unpaid.

A special assessment of $200, payable to the United States, is mandatory and shall be due immediately.

The terms of this sentence are subject to modification at the sentencing hearing scheduled for January 30, 2014.

It is so ordered.

**New York, NY**
**January 27, 2014**

_____
ROBERT W. SWEET
U.S.D.J.